1  Daniel C. Cotman (CBN 218315)
   dan@cotmanip.com
2  Rasheed McWilliams (SBN 281832)
3  Rasheed@cotmanip.com
   Obi I. Iloputaife (SBN 192271)
4  obi@cotmanip.com
5  COTMAN IP LAW GROUP, PLC
   35 Hugus Alley, Suite 210
6  Pasadena, CA 91103
7  (626) 405-1413/FAX: (626) 316-7577

8
   Keith A. Vogt, Esq. (*Pro Hac Vice Application Pending*)
9  keith@vogtipo.com
   1033 South Blvd., Suite 200
10 Oak Park, IL 60302
11 (708) 203-4787

12
   *Attorneys for Plaintiff*
13 GREGORY C. JAMES

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Gregory C. James, an Individual, | Case No. 2:16-cv-05769 |
| Plaintiff, | **COMPLAINT FOR CORRECTION OF INVENTORSHIP** |
| v. | |
| | **DEMAND FOR JURY TRIAL** |
| j2 Cloud Services, Inc. and Advanced Messaging Technologies, Inc. | |
| Defendants. | |

1
**COMPLAINT**

Plaintiff, Gregory C. James, aka Greg James ("James" or "Plaintiff"), by his undersigned counsel, hereby complains of Defendants j2 Cloud Services, Inc. (formerly known as j2 Global, Inc. and, before that, j2 Global Communications, Inc. and, before that, JFAX Communications, Inc.) ("JFAX") and Advanced Messaging Technologies, Inc. ("AMT") (together, "Defendants") and for his Complaint hereby alleges as follows:

## NATURE OF THE ACTION

1. This is an action for damages and equitable relief arising from the wrongful conduct of Defendants in, among other things, obtaining and using Plaintiff's intellectual property. The action includes a claim to correct inventorship pursuant to 25 USC ¶ 256 (Count I) as well as related claims for unjust enrichment (Count II) and fraudulent concealment (Count III).

## THE PARTIES

2. James is an individual, a citizen of Australia, and residing at 3/42 Golf Ave Mona Vale 2103, Australia.

3. Defendant JFAX is a corporation organized under the laws of the State of Delaware with its principal place of business at 6922 Hollywood Boulevard, Suite 500, Los Angeles, California 90028.

4. Defendant Advanced Messaging Technologies, Inc. is a Delaware corporation with its principal place of business at 6922 Hollywood Boulevard, Suite 500, Los Angeles, California 90028, and is a wholly owned subsidiary of j2. The term "j2" shall be used herein to mean either j2 Cloud Services, Inc. or j2 Cloud Services, Inc. and AMT collectively, as the context warrants.

## JURISDICTION AND VENUE

5. This Court has exclusive subject matter jurisdiction pursuant to 28 U.S.C. §1338(a) under the Patent Laws of the United States.

6. This Court further has supplemental jurisdiction over the subject matter of James' state law claims pursuant to 28 U.S.C. § 1367(a), in that the claims are so related to James' federal claim that they form part of the same case or controversy.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in the State of California and reside in this District and elsewhere in this Judicial District.

8. This Court has personal jurisdiction over each Defendant, in that each of them resides in this State and federal judicial district and conducts significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and federal judicial district.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

9. JFAX was created by a musician born in East Germany named Jaye Muller ("Muller") and his producer and manager Jack Rieley, a former producer of the Beach Boys (Rieley"). On or about November 1995, while residing and working in Australia, James was introduced to JFAX through a friend, Chris Darwin.  JFAX needed someone who could develop, design and implement software solutions any systems for use by JFAX.

10. Thereafter, James had discussions with Rieley, representing JFAX as its Chairman and CEO, in which Rieley inquired if James could develop original software solutions and systems that would provide Fax-to-Email, Email-to-Fax, and Voicemail-to-Email functionalities for JFAX.

11. After the discussions, Rieley on behalf of JFAX and James agreed that James, as a consultant to JFAX, would create and develop original software solutions and systems that would enable JFAX to offer Fax-to-Email, Email-to-Fax, and Voicemail-to-Email services to customers.

12. Nobody at JFAX provided input about how James should create the Fax-to-Email, Email-to-Fax and Voicemail-to-Email software system JFAX wanted.  The instructions provided to James from JFAX for the Fax-to-Email and Voicemail-to-Email functionalities was that JFAX needed a system that could receive fax and voicemail transmissions over the telephone line and convert and forward the received transmissions (fax or voicemail) to a recipient's email address.

13. During November 1995 and December 1995, while still in Australia, James created the requested system and wrote a software program that provided Fax-to-Email functionality (hereinafter "JFAX Inbound Fax System"). James did not receive any direction or technical help from anyone at JFAX for the development of the JFAX Inbound Fax System. The code, functionality and operation of the system were all developed by James. The solutions James conceived and reduced to practice include, among other things, concerned methods and apparatus for accepting an incoming message over a traditional telephone network by using a circuit switched network and transmitting it over the Internet using a packet switched network.

14. On December 25, 1995, while having Christmas lunch, Rieley called James for a demonstration of the JFAX Inbound Fax System as he wanted to demonstrate the Fax-to-Email functionality developed by James to a person James understood to be a potential investor. He and the potential investor were in the United States and James was in Australia. James hooked up the telephone to a personal computer that had the system (software and modem) and ran a demonstration of the JFAX Inbound Fax System he created for JFAX.

15. In January 1996, upon invitation by JFAX, James travelled to New York to install the JFAX Inbound Fax System he had developed and to connect the communications networks. He stayed in New York through August 1996. While in New York, James worked on making the JFAX Inbound Fax System more robust.

16. On February 11, 1996, a letter Software Development Agreement was executed by both James and Rieley. A true and correct copy of the agreement is attached herewith as **Exhibit A**.

17. Between February 11 and August 1996, James deployed the JFAX Inbound Fax System in New York, London, Los Angeles, and Atlanta for JFAX, using telephone numbers acquired by JFAX from telephone companies.

18. JFAX distributed these telephone numbers to several customers who used them in conjunction with the JFAX Inbound Fax System (i.e. Fax-to-Email).

19. The JFAX Inbound Fax System installed in New York, Los Angeles and Atlanta included a server with a Brooktrout T1 card that could handle up to 23 lines simultaneously plus call control.

20. The JFAX Inbound Fax System installed in London included a server with a Brooktrout E1 card that could handle up to 31 lines simultaneously plus call control.

21. The JFAX Inbound Fax System conceived, developed and deployed by James was configured to receive incoming fax calls over the telephone line. In one aspect, the JFAX Inbound Fax System accomplished this step by receiving an incoming fax call via the Brooktrout T1 card installed in the server and then converting the fax signal into a graphics (e.g. TIFF) file.

22. Another element of the JFAX Inbound Fax System conceived, developed and deployed by James extracts the destination fax number from the incoming signal and uses it to determine the destination email address to which the JFAX Inbound Fax System would send the email containing the graphics (e.g. TIFF) file.

23. Another element of the JFAX Inbound Fax System conceived, developed and deployed by James determines the user account status based on the destination fax number and then sends the email containing the graphics file to the destination email address.

24. The JFAX Inbound Fax System, deployed between February and August 1996 by James, was configured with the capability to handle redundancy in two ways: 1) failure switching can be performed at the hardware level by the telephone company switch (equipment). In this configuration, two servers with the same JFAX Inbound Fax System and T1 card are connected through a telephone company switch with one server serving as the primary and the second server serving as the backup. When the telephone company's system detects either a no-answer or a busy signal from the primary server, the call is rerouted to the backup server through the switch. 2) For redundancy, the JFAX Inbound Fax System also had the capability to switch to a second Internet Service Provider (ISP) if the primary ISP went down. This was

necessary because ISPs at the time were somewhat unreliable and had periodic outages. The system as configured included an Ethernet connection and a backup modem to another ISP. The Ethernet connection was connected to the ISP router as the system it was housed in the ISP premises, and a backup modem connected to a secondary ISP. If the first ISP went down, the system switched to the backup ISP for purposes of sending email communications to users.

25. Between January and July 1996, while in New York, James created original software that would enable Email-to-Fax functionalities (hereinafter "JFAX Outbound System"). The only instructions provided to James from anyone at JFAX about the Email-to-Fax functionality was that they needed a system for converting and sending an email message to a recipient's fax machine over the telephone network. The method utilized by the software was conceived and entirely developed by James as he did not receive any direction or technical help from anyone at JFAX for the development of this JFAX Outbound system. The technical aspects of the code, functionality and operation of the system were all conceived and implemented by James.

26. One element of the JFAX Outbound system conceived and developed by James in 1996 was configured to receive emails from the Internet by using the existing UNIX Sendmail program, which is able to receive emails. Sendmail automatically queues email messages in the order they are received.

27. Another element of the JFAX Outbound system conceived and developed by James in 1996 extracts the sender's email address and checks whether the sender's email address was associated with a valid user account. If so, it extracts the destination fax number from the destination email address (i.e. TO: field).

28. Another element of the JFAX Outbound system conceived and developed by James in 1996 reads and processes the queued messages in the order they are received.

29. Another element of the JFAX Outbound system conceived and developed by James in 1996 converts the read email messages to TIFF, sends the TIFF file and

the destination fax phone number to a fax card installed on the server. The fax card then converts the TIFF file to a fax format, calls the destination fax number and transmits the converted file to a fax machine connected to the telephone number on the PSTN network. The fax card was an off the shelf product provided by a third party (i.e. Brooktrout).

30. On or around April 1996, while in New York, James created software that would enable Voicemail-to-email functionalities (hereinafter "JFAX Voicemail System"). The only instruction provided to James from anyone at JFAX about the Voicemail-to-email functionality was that they needed a system for converting and sending a voicemail message to a recipient's email address. The method utilized by the software was conceived and entirely developed by James as he did not receive any direction or technical help from anyone at JFAX for the development of this JFAX Voicemail System. The technical aspects of the code, functionality and operation of the system were all conceived and implemented by James.

31. One element of the JFAX Voicemail System conceived, developed and deployed by James is configured to receive incoming audio calls over the telephone line. The JFAX Voicemail System accomplished this step by receiving an incoming audio message via the Brooktrout T1 card installed in the server and then converting the audio message into an audio file (e.g. .wav file).

32. Another element of the JFAX Voicemail System conceived, developed and deployed by James extracts the destination telephone number from the incoming signal and uses it to determine the destination email address to which the JFAX Voicemail System would send the email containing the audio file.

33. Another element of the JFAX Voicemail System conceived, developed and deployed by James determines the user account status based on the destination telephone number and then sends the email containing the audio file to the destination email address.

34. The redundancy aspect of JFAX Voicemail System conceived, developed and deployed by James was the same as that for the JFAX Inbound Fax System.

Specifically, 1) failure switching can be performed at the hardware level by the telephone company switch (equipment). In this configuration, two servers with the same JFAX Voicemail System and T1 card are connected through a telephone company switch with one server serving as the primary and the second server serving as the backup. When the telephone company's system detects either a no-answer or a busy signal from the primary server, the call is rerouted to the backup server through the switch. 2) For redundancy, the JFAX Voicemail System also had the capability to switch to a second Internet Service Provider (ISP) if the primary ISP went down. This was necessary because ISPs at the time were somewhat unreliable and had periodic outages. The system as configured included an Ethernet connection and a backup modem to another ISP. The Ethernet connection was connected to the ISP router as the system it was housed in the ISP premises, and a backup modem connected to a secondary ISP. If the first ISP went down, the system switched to the backup ISP for purposes of sending email communications to users.

35. On August 30, 1996, James assigned all copyrights to the software for the JFAX Inbound Fax System, JFAX Outbound system, and JFAX Voicemail System to JFAX. However, James did not assign any patent ownership or inventorship rights to JFAX or any other entity for the inventions embodied in JFAX Inbound Fax System, JFAX Outbound system, or JFAX Voicemail System. **Exhibit A.**

36. On or around August 31, 1996, James left New York and returned to Australia.

37. On September 23, 1996, in a New York Times article, JFAX acknowledged that Messrs. Rieley and Muller lacked the technical expertise to create the JFAX system. To overcome this shortcoming, JFAX turned to James and hired him to develop the systems used by JFAX:

> After two years of intensive work by an Australian telecommunications software development team, JFAX was born. While they will not disclose how much has been spent on the product so far, Mr. Rieley said that "more than a couple of million dollars" of his own and Mr. Muller's money had been invested in JFAX.

**Exhibit B**.

38. On April 1, 1997, JFAX filed for a patent application entitled "METHOD AND APPARATUS FOR TRANSMISSION AND RETRIEVAL OF FACSIMILE AND AUDIO MESSAGES OVER A CIRCUIT OR PACKET SWITCHED NETWORK," which named Rieley and Muller as the only two inventors. The application issued as U.S. Patent. No. 6,208,638 on March 27, 2001 (the "'638 patent"). **Exhibit C**.

39. James was not aware of the patent application filed by JFAX that resulted in the '638 patent until JFAX began to enforce the patent. James only became aware that JFAX had improperly named Rieley and Muller as the inventors of the '638 patent in November 2013 when he was contacted by attorneys representing one of the defendants in a patent infringement litigation in the Central District of California involving the '638 patent. Until this time, James had no knowledge that JFAX had fraudulently concealed that it had omitted him from being the named inventor of the '638 patent. To this end, JFAX waited until James had left the United States before filing the patent application.

40. Nor had James any reason to believe that JFAX was going to seek patent protection on the systems he developed since the agreement between the parties never addressed how any resulting patent rights would be handled. In accordance with the agreement, the only assignments James was asked to execute concerned software. Nor would James have been motivated to scour the United States Patent and Trademark Office ("USPTO") each year to determine whether he should have been named as an inventor on any patents filed by JFAX. He was not a competitor of JFAX, he did not work in the fax to e-mail market, and he had no ongoing relationship with JFAX.

41. JFAX has falsely represented and warranted to this Court and others as well as to numerous defendants in patent infringement actions involving the '638 patent that JFAX owned the exclusive rights to the '638 patent when in fact it did not.

42. An example of such an assertion is found in JFAX has falsely represented and warranted to each of the defendants in licensing transactions that JFAX owned the exclusive rights to the '638 patent when in fact it did not. For example, in j2 Glob., Inc. v. Fax87.com, No. CV 13-05353 DDP (AJW), (C.D. Cal. 2013), JFAX represented to this Court and the defendants that it was suing that it held the exclusive rights to the '638 patent:

> 28. In July 2014, j2 assigned the '638 Patent to AMT. Under the assignment agreement, j2 retained an exclusive license to the '638 Patent, which includes the right to sue for past, present and future claims of infringement, and seek and collect past, present and future damages.
>
> **COUNT 4**
> **Infringement of U.S. Patent Number 6,208,638**
> **(Against All Defendants)**
>
> 245. Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.
>
> 246. AMT is the owner by assignment of the '638 Patent. j2 is the exclusive licensee of the '638 Patent.

(See ECF No. 43.)

43. On information and belief, JFAX has also falsely represented and warranted to numerous defendants in licensing/settlement agreements that JFAX owned the exclusive rights to the '638 patent when in fact it did not. Thus, JFAX has been unjustly enriched by its claims of false exclusivity to the '638 patent. Accordingly, JFAX has incrementally benefited and profited from this wrongful claim of exclusivity to the '638 patent by avoiding the cost of remunerating James to secure the exclusive rights owned by James by, at a minimum, an assignment, an exclusive

license or in other ways common to the industry to secure the cooperation and exclusive rights held by a patent owner.

## COUNT I
## CORRECTION OF INVENTORSHIP
## UNDER 35 U.S.C. § 256 ('638 PATENT)

44. Plaintiff James hereby incorporates by reference the allegations set forth in the above paragraphs of this Complaint as if fully set forth herein.

45. The '638 patent issued on March 27, 2001. The currently named inventors are Jack Rieley and Jaye Muller. The patent is now owned by AMT. A copy of the '638 patent is attached to this complaint as **Exhibit C.**

46. Plaintiff claims sole inventorship and ownership of the '638 patent.

47. The '638 patent claims the systems and methods of the JFAX Inbound Fax System and JFAX Voicemail System invented by James and described above. This is corroborated by the New Times Article in which JFAX acknowledge James as the developer of the JFAX technology as well as by the copyright assignments executed by James which cover the following work/programs conceived and created by James, including the JFAX's Fax to E-Mail, Voice to E-Mail, and E-mail to Fax technology:

**COPYRIGHT ASSIGNMENT**

The undersigned warrants that the Fax to E-Mail software program (the "work") as designated below was the creation of the undersigned either solely, jointly, or as a work for hire for the undersigned, that all copyrights in the work in the United States and throughout the world, together with any rights of action which may have accrued under said copyrights, which are owned by the undersigned, are hereby assigned for One Dollar ($1.00) and other good and valuable consideration as separately agreed to between the parties, the receipt of which is hereby acknowledged, to JFAX Communications, Inc.

Work: JFAX-FAX to E-MAIL
(specify the type of program)
Completed:
Dated: August 30 1996  By: Greg James

> **COPYRIGHT ASSIGNMENT**
>
> The undersigned warrants that the E-Mail to Fax software program (the "work") as designated below was the creation of the undersigned either solely, jointly, or as a work for hire for the undersigned, that all copyrights in the work in the United States and throughout the world, together with any rights of action which may have accrued under said copyrights, which are owned by the undersigned, are hereby assigned for One Dollar ($1.00) and other good and valuable consideration as separately agreed to between the parties, the receipt of which is hereby acknowledged, to JFAX Communications, Inc.
>
> Work: JFAX - E-Mail to Fax. (Beta Version)
> (specify the type of program)
>
> Completed:
>
> Dated: August 30 1996    By: Greg James

**Exhibit A.**

> **COPYRIGHT ASSIGNMENT**
>
> The undersigned warrants that the Voice to E-Mail software program (the "work") as designated below was the creation of the undersigned either solely, jointly, or as a work for hire for the undersigned, that all copyrights in the work in the United States and throughout the world, together with any rights of action which may have accrued under said copyrights, which are owned by the undersigned, are hereby assigned for One Dollar ($1.00) and other good and valuable consideration as separately agreed to between the parties, the receipt of which is hereby acknowledged, to JFAX Communications, Inc.
>
> Work: JFAX - Voice Mail to E-Mail.
> (specify the type of program)
>
> Completed:
>
> Dated: August 30 1996    By: Greg James

48.    The claims of the '638 patent and the re-examined patent were conceived solely by James.

49.    Under 35 U.S.C. § 256, James should have been named as the sole inventor of the inventions claimed in the '638 patent, but was omitted without any deceptive intention on his part. He seeks now to be named properly as the sole inventor and owner of the '638 patent.

## COUNT II

## UNJUST ENRICHMENT

50.    Plaintiff James hereby incorporates by reference the allegations set forth in the above paragraphs of this Complaint as if fully set forth herein.

51. James is the sole inventor of the '638 patent.

52. JFAX never made an agreement with James to transfer the exclusive rights he owned in the inventions of the '638 patent and JFAX never paid James to transfer, assign, license or assist JFAX in acquiring the exclusive rights to any of the inventions claimed in the '638 patent.

53. James provided JFAX with his valuable inventions expecting to be compensated.

54. JFAX deliberately and willfully left Plaintiff's name off of the application that led to the issuance of the '638 patent. JFAX intentionally concealed the filing of the patent application from James in order to retain all benefits to the '638 patent, including the exclusive rights to the patent, in order to deprive James of the ability to negotiate fair and just terms for the transfer of his exclusive rights to JFAX or the ability for James to license others, such a JFAX's competitors, the rights to use the patented technology.

55. James is entitled to all of JFAX's ill-gotten gains including any incremental profits it realized by falsely claiming it held the exclusive rights to the '638 patent in its licensing transactions. It would be both inequitable and unconscionable to allow JFAX to retain its ill-gotten gains.

56. As a direct and proximate result of JFAX's conduct, Plaintiff has been injured in an amount to be determined at trial.

57. Plaintiff is informed and believes, and alleges thereon, that in engaging in the acts described above, JFAX acted with oppression, fraud and/or malice. The acts of JFAX have been despicable and undertaken in conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to an award of punitive damages against JFAX in an amount sufficient to punish and make an example of them according to proof.

58. Plaintiff does not have an adequate remedy at law, and will continue to be damaged by JFAX's use and enforcement of Plaintiff's inventions unless this Court enjoins JFAX from such unfair and unjust business practices.

# COUNT III
# FRAUD BY CONCEALMENT

59. Plaintiff James hereby incorporates by reference the allegations set forth in the above paragraphs of this Complaint as if fully set forth herein.

60. Plaintiff invested almost a year of his life in a foreign country conceiving and reducing to practice the inventions claimed in the '638 patent.

61. Plaintiff is the sole inventor of the 638 patent.

62. JFAX never made an agreement with James to transfer the exclusive rights he owned in the inventions of the '638 patent and JFAX never paid James to transfer, assign, license or assist JFAX in acquiring the exclusive rights to any of the inventions claimed in the '638 patent.

63. JFAX concealed from James that it was filing a patent on the systems he conceived and developed that named Rieley and Muller as the inventors.

64. JFAX had a duty to disclose the filing of the patent application to James under, at least, the Patent Laws of the United States.

65. JFAX intentionally concealed the filing of the patent application from James in order to retain all benefits to the '638 patent, including the exclusive rights to the patent, in order to deprive James of the ability to negotiate fair and just terms for the transfer of his exclusive rights to JFAX or the ability for James to license others, such a JFAX's competitors, the rights to use the patented technology.

66. James was unaware that JFAX had deliberately and willfully left his name off of the application that has led to the issuance of the '638 patent and omitted to inform James of the patent filing.

67. As a direct and proximate result of JFAX's conduct, James has been injured in an amount to be determined at trial by being deprived of the ability to negotiate compensation for his creation of the inventions contained in the '638 patent.

68. Plaintiff is informed and believes, and alleges thereon, that in engaging in the acts described above, JFAX acted with oppression, fraud and/or malice. The acts of JFAX have been despicable and undertaken in conscious disregard of Plaintiff's

rights.  Accordingly, Plaintiff is entitled to an award of punitive damages against JFAX in an amount sufficient to punish and make an example of them according to proof.

69. Plaintiff does not have an adequate remedy at law, and will continue to be damaged by JFAX s use and enforcement of Plaintiff's inventions unless this Court enjoins JFAX from such fraudulent practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against the Defendants as follows:

A. For an order to the USPTO to correct the '638 patent to name Gregory C. James as the inventor;

B. For an order to the USPTO to correct the '638 patent to remove Jack Rieley and Jaye Muller as inventors;

C. For general damages in an amount according to proof at trial;

D. For special damages in an amount according to proof at trial;

E. For appropriate injunctive relief;

F. For costs;

G. For reasonable attorney's fees;

H. For pre-judgment and post-judgment interest;

I. For such other relief as the Court may deem appropriate.

/ / /

/ / /

/ / /

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all issues and causes of action triable to a jury.

Respectfully submitted,

DATED:  August 3, 2016      **COTMAN IP LAW GROUP, PLC**

s/Obi I. Iloputaife
By:_____
    Obi I. Iloputaife
    Daniel C. Cotman
    Rasheed M. McWilliams

COTMAN IP LAW GROUP, PLC
35 Hugus Alley, Suite 210
Pasadena, CA 91103
Telephone: (626) 405-1413
Facsimile:  (626) 316-7577

Keith A. Vogt, Esq.
keith@vogtip.com
1033 South Blvd., Suite 200
Oak Park, IL 60302
(708) 203-4787

*Attorneys for Plaintiff*
*Gregory C. James*